UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GIOVANNA E. NARDI (ECKER), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 C 8723 |
| | ) | |
| ALG WORLDWIDE LOGISTICS and | ) | Judge Rebecca R. Pallmeyer |
| TRANSPORT LEASING CONTRACT, INC. , | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

Plaintiff Giovanna Nardi began working for ALG Worldwide Logistics ("ALG") in January 2006. ALG utilizes the services of Transport Leasing/Contract, Inc. ("TLC"), a professional employer organization, to provide human resources services, including payroll and benefits administration. By October 2006, Nardi's supervisors at ALG had issued her two written warnings—on forms provided by TLC—for behavior that ALG deemed defiant and uncooperative. Nardi alleges that her attitude was a reaction to seeing her co-workers view pornographic websites while at work, which upset her and made her uncomfortable. On November 1, 2006, a co-worker at ALG forwarded Nardi a "pornographic e-mail." The following day, pursuant to a sexual harassment policy drafted by TLC, Plaintiff submitted a complaint about the e-mail to TLC. Nine days later, she was fired.

In the resulting lawsuit for sex discrimination and retaliation, Nardi named both ALG and TLC as Defendants. For reasons her attorney has not explained, however, ALG was never served. TLC (but not Ms. Nardi herself) sought discovery and now moves for summary judgment [23], arguing that it cannot be liable under Title VII because it was not Nardi's employer. If the court concludes that TLC was Nardi's employer, TLC contends it is nevertheless entitled to summary judgment on her claims of sex discrimination and retaliation. The reasons for Ms. Nardi's termination are not clear to the court; ALG's reasons for issuing

disciplinary notices are uncertain, as well. Still, though her termination followed swiftly on the heels of her complaint about a hostile work environment, Ms. Nardi admits that an ALG employee, who had no knowledge of her November 2 complaint, made the decision to fire her. And regardless, even though ALG used personnel forms prepared by TLC, Nardi has not offered evidence sufficient to establish that TLC was her employer. TLC's motion for summary judgment is therefore granted.

## **BACKGROUND**[1]

In January 2006, Defendant ALG Worldwide Logistics, a small trucking company, hired Plaintiff Giovanna Nardi as a clerical processing coordinator. Her job responsibilities included data entry for shipping orders and filing. It was Steve Cargill, ALG's office manager, who interviewed and selected Nardi for the job.

ALG contracts with co-Defendant Transport Leasing/Contract, Inc. ("TLC"), described as a "driver leasing professional employer organization that provides administrative human resource services and related functions for small to midsized trucking companies." (Def.'s Statement of Undisputed Material Facts [25], hereinafter "D. SOF," ¶ 3; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts [30], hereinafter "Pl.'s Resp. to SOF" ¶ 3.) TLC provided administrative services for ALG, such as processing payroll and benefits, but the

---

[1] Though represented by counsel, Plaintiff declined to conduct discovery in this case (TLC Mem. in Supp. of its Mot. for Summ. J. [24], 7 n.5), and the record is, accordingly, sparse. Defendant offers a handful of declarations from ALG and TLC employees, Plaintiff's deposition testimony, and some copies of relevant documents, including copies of Plaintiff's written warnings. In response, Plaintiff presents only her own 14-paragraph declaration and a copy of her notice of termination from TLC. Moreover, many of Plaintiff's denials contain no, or inadequate, citations to the record. Under local rules, a party opposing summary judgment is required to respond to each numbered paragraph of the moving party's statement of fact and, in the case of any disagreement, provide "specific references to the affidavits, parts of the record, and other supporting materials relied upon[.]" N.D. Ill. Local R. 56.1(b)(3)(B). The result of noncompliance is significant: "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.* 56.1(b)(3)(C). Where Plaintiff has not adequately supported her denials with citations to the record, TLC's statements of fact are deemed admitted. The facts presented here are based on this limited record.

parties agree that TLC's clients "recruit, interview, and hire their own candidates." (D. SOF ¶¶ 4-6; Pl.'s Resp. to SOF ¶¶ 4-6.) In addition to payroll services, TLC provides ALG with human resources forms, including employee warning notices, employee termination notices, and employee handbooks, all of which bear TLC's logo. (Def.'s SOF ¶ 8; Pl.'s Resp. to SOF ¶ 8.) After ALG decided to hire Plaintiff, it submitted her information to TLC so that TLC could process payroll and administer her benefits. (D. SOF ¶¶ 4, 12; Pl.'s Resp. to SOF ¶ 4, 12.) Plaintiff received a copy of an employee handbook provided by TLC, which contains a sexual harassment policy. (D. SOF ¶ 15; Pl.'s Resp. to SOF ¶ 15.) That policy defines and prohibits sexual harassment and establishes an internal complaint procedure: An employee who has been the subject of sexual harassment is directed to "immediately report the conduct to your supervisor (unless that person is responsible for the harassment, then report such conduct to your supervisor's manager) and to the Employee Resource Specialist," through a telephone hotline. (Employee Handbook, Sexual Harassment Policy, Ex. D to Decl. of Jim Hezinger, Ex. C to D. SOF [25-3 at page 16].)

Soon after Nardi started working, her supervisors at ALG reported problems with her attitude. TLC asserts that during her first few months of work, Nardi was obstinate with her supervisor, Keith Ashton; swore excessively in the office; and made inappropriate gestures behind Ashton's back. (D. SOF ¶¶ 18–19.) Nardi denies swearing (Nardi Dep. at 40:18–41:3), and denies exhibiting a bad attitude at work (Pl.'s Resp. to SOF ¶¶ 17–18), but the deposition testimony she cites in support of that denial confirms that Nardi disliked Ashton, felt he "was always patronizing and dominant, trying to make a case about his being my superior," and did not like the fact that Ashton, her supervisor, would "boss [her] around[.]" (Nardi Dep. at 92:24–93:7.) Ashton and Cargill, the office manager, verbally reprimanded Nardi for her behavior, and then Cargill prepared a written warning on May 18, 2006. (D. SOF ¶¶ 20–21.) Plaintiff agrees that she received the warning, but claims that she "tried to have a nice attitude." (Pl.'s Resp. to SOF ¶¶ 21, 50.) The warning appears on a form bearing the TLC logo, but it is signed by

3

Cargill, an ALG employee. (May 18, 2006 Warning, Ex. A to Decl. of Diane Hofstadter, Ex. A to D. SOF [25-3 at page 7], hereinafter "May Warning.") The warning cites Nardi for "violation of company procedures," and states that Nardi "told several employees that she didn't like the way some people talk to her and she is looking for a new job. This attitude can undermine employee morale in the office." (*Id.*) The warning notes that "if this attitude continues, suspension or termination may result." (*Id.*) Nardi signed the warning, but checked a box noting her disagreement with the description of the violation. According to Nardi, she "talked to Gerri[2] about not being able to go to the hospital. And mentioned I am looking for a job closer to my house." (*Id.*)

Five months later, on October 23, Ashton prepared a second written warning. (D. SOF ¶ 26; Pl.'s Resp. to SOF ¶ 26.) According to Ashton, when Nardi was "asked to do her job correctly within company guidelines I get an attitude where she will not speak to me all day and sometimes into the next day." (Oct. 23, 2006 Warning, Ex. B to Decl. of Diane Hofstadter, Ex. A to D. SOF [25-3 at page 9], hereinafter "Oct. Warning.") The record does not reveal how Nardi's conduct deviated from "company guidelines"; it is undisputed, however that she was placed on probation and cautioned that she could be suspended or terminated if she received another warning. (*Id.*) Plaintiff refused to sign the second written warning (*id.*), but she now acknowledges that she received it. (Pl.'s Resp. to SOF ¶¶ 26–28.) Though both warnings appear on forms with TLC's logo, Plaintiff agrees that TLC did not discipline Plaintiff, did not review her performance, and did not set her hours. (D. SOF ¶ 14; Pl.'s Resp. to SOF ¶ 14.)

Though Nardi denies having a negative attitude (*see* Pl.'s Resp. to SOF ¶ 50 ("Plaintiff tried to have a nice attitude")), elsewhere, she asserts that her attitude was a response to her

---

[2] The record does not explain who "Gerri" is. In her deposition testimony, however, Nardi describes a dispute with Steve Cargill, Pat Delmonico, and Keith Ashton about taking a day off to visit her daughter-in-law, who was in the hospital with a newborn. (Nardi Dep. at 136:21– 139:25.)

4

co-workers' conduct. According to Nardi, shortly after she began working, she noticed that her co-workers viewed pornographic websites on their work computers during work hours. (Decl. of Giovanna Nardi, Ex. A to Pl.'s Resp. to SOF [30-1], hereinafter "Nardi Decl.," ¶ 6.) This conduct "was demoralizing and very upsetting to [Plaintiff] and [she] became very uncomfortable." (*Id.* ¶ 7.) She does not say how often she witnessed this behavior, nor is there any evidence that she reported it to a supervisor.

Then, on November 1, 2006, Plaintiff overheard one of her co-workers, Roberta Allen, laughing at her desk. (D. SOF ¶ 30; Pl.'s Resp. to SOF ¶ 30; Nardi Decl. ¶ 8.) Plaintiff asked Allen why she was laughing, and Allen told Plaintiff that she was looking at a funny e-mail. (D. SOF ¶ 31; Pl.'s Resp. to SOF ¶ 31.) Plaintiff asked to see the e-mail, not knowing its contents. (D. SOF ¶ 33; Pl.'s Resp. to SOF ¶ 33; Nardi Decl. ¶ 8.) Before Allen forwarded the e-mail to Nardi, Allen called Keith Ashton, Plaintiff's supervisor, seeking permission to share it. (Dep. of Giovanna Nardi, Ex. D to D. SOF [25-4], hereinafter "Nardi Dep.," 98:4–6.) Nardi overheard Ashton (who presumably had already seen the e-mail message) speaking through Allen's phone; Ashton stated, "she's okay, she's ok," referring to Nardi, and allowed Roberta to share the e-mail. (Dep. of Giovanna Nardi, Ex. D to D. SOF [25-4], hereinafter "Nardi Dep.," 98:4–8.) The subject line of the e-mail read: "What Men Do When They Get Bored – adult content." The e-mail message included five pictures of uncensored, anthropomorphized penises "wearing" various costumes. (D. SOF ¶¶ 34, 35; Pl.'s Resp. to D. SOF ¶¶ 34,35; Nov. 1, 2006 E-Mail, Ex. C to Hezinger Decl., Ex. C to Def.'s SOF [25-3 at pages 11-14].) Plaintiff does not dispute that after she received the e-mail, she sent it to her husband and told Allen that her husband would think the e-mail was funny too. (D. SOF ¶ 36; Pl.'s Resp. to SOF ¶ 36.) She testified, however, that she was not in fact "okay" with the message, and that she forwarded the e-mail to her husband to provide an example of the pornographic content her coworkers viewed at work, and to ask his advice on how to respond. (Nardi Dep. at 65:3–6, 69:19–23.)

5

On November 2, 2006, Plaintiff's then-husband, Steven Nardi, called the phone number for the Employee Resource Specialist listed in TLC's Employee Handbook. (D. SOF ¶ 37; Pl.'s Resp to D. SOF ¶ 37; Nardi Decl. ¶ 10.) Diane Hofstadter, TLC's Corporate Paralegal, received the call. (D. SOF ¶ 38; Pl.'s Resp. to SOF ¶ 38.) Mr. Nardi informed Hofstadter that Plaintiff had received a "pornographic e-mail" from a co-worker. (D. SOF ¶ 39; Pl.'s Resp. to SOF ¶ 39; Nardi Decl. ¶ 10.) Hofstadter asked to speak to Plaintiff directly, but Plaintiff declined to speak with her; Plaintiff had asked her husband to make the call because he speaks better English than she does. (D. SOF ¶ 39; Pl.'s Resp. to SOF ¶ 39; Nardi Decl. ¶ 11.) Hofstadter contacted Pat Hezinger, ALG's Director of Human Resources to report the incident, and Hezinger initiated an investigation. (D. SOF ¶¶ 43–44; Pl.'s Resp. to SOF ¶¶ 43–44.)

Nardi does not dispute TLC's description of Hezinger's investigation. Hezinger asked to speak to Ashton, Allen, and Nardi. (Decl. of Jim Hezinger, Ex. C to D. SOF [25-3], hereinafter "Hezinger Decl." ¶ 14.) Nardi herself refused to speak with Hezinger. (*Id.*) From Ashton and Allen, Hezinger learned that Plaintiff had asked to see the e-mail, and had asked Allen to help her forward it to her husband. (D. SOF ¶ 45; Pl.'s Resp. to SOF ¶ 45.) Hezinger advised Ashton and Allen that the e-mail was inappropriate, but concluded that there was no violation of company policy and declined to discipline Ashton, Allen, or Nardi. (D. SOF ¶ 46; Pl.'s Resp. to D. SFO ¶ 46.) After completing the investigation, Hezinger informed Hofstadter of the results, and advised Hofstadter that "she had informed all individuals involved that the e-mail was inappropriate." (D. SOF ¶ 47; Pl.'s Resp. to D. SFO ¶ 47.) TLC took no further action.

TLC asserts, based on Cargill's declaration, that "Plaintiff's insubordination continued after her second written warning," and that she continued to behave in an unprofessional manner. (D. SOF ¶ 48; Decl. of Steve Cargill, Ex. E to D. SOF [25-5], ¶¶ 5–6.) Plaintiff denies this, stating that "the atmosphere in the office was tense, Plaintiff believed all her actions were being followed and reported," but that she "tried to be nice." (Pl.'s Resp. to D. SOF ¶ 48.) She cites to her deposition testimony, which confirms her fear that she was being watched by her co-

6

workers, but also explains that she "was trying to soften [her] attitude, but it was very hard for [her] given the circumstances." (Nardi Dep. at 50:23—51:22.)

On November 10, 2006, Steve Cargill, ALG's office manager, determined that Plaintiff's behavior was disruptive and recommended to Pat Delmonico, one of ALG's owners, that Plaintiff be fired. (D. SOF ¶¶ 50–52; P. Resp. to D. SOF ¶ 51.) Defendant asserts that Cargill did not know about the e-mail or Plaintiff's complaint when he made this recommendation. (D. SOF ¶ 52.) Plaintiff denies this, but the material she cites (the declaration of Jim Hezinger) confirms TLC's assertion. In his declaration, Hezinger, ALG's CEO, states, "Cargill was not involved in the investigation concerning the e-mail and did not know that Nardi's husband had made a complaint about the e-mail when he recommended termination." (Hezinger Decl. ¶ 17.) Once Cargill decided to recommend termination, someone at the company sent a "separation report" to TLC. (D. SOF ¶ 56; Pl.'s Resp. ¶ 56.) TLC does not state who sent the report, and the report itself does not appear in the record. Upon receiving this separation report, "as a matter of course," TLC also terminated its "administrative employment relationship" with Plaintiff. (D. SOF ¶ 57; Pl.'s Resp. to SOF ¶ 57; TLC Reply Br. [35], hereinafter "TLC Reply," 4 n.4.)

That same day, Ms. Nardi received a letter from "The TLC Companies Personnel Department," which states, "Please be advised that effective November 10, 2006 you are no longer an employee of The TLC Companies," and provides information on how to extend her insurance and benefits. (Termination Letter, Ex. B to Pl.'s SOF [30-2], hereinafter "Termination Letter.") On May 8, 2007, Nardi filed a charge of discrimination against ALG and TLC with the Illinois Department of Human Rights and the EEOC. (*See* Appendix to Compl. [1-1], 1–3.) The EEOC issued a right to sue letter on September 6, 2013 following unsuccessful attempts at conciliation. (*Id.* at 7, 10.) Plaintiff filed her complaint in this case on December 6, 2013, but as TLC notes, she has not served ALG. (TLC Mem. in Supp. of its Mot. for Summ. J. [24], hereinafter "TLC Mem.," 2.) There is no return of service on ALG in the court's docket, nor has

7

ALG made any appearance in this case, through counsel or otherwise. When asked at oral argument why ALG had not been served, Plaintiff's counsel had no answer. TLC now moves for summary judgment.

## DISCUSSION

The court will grant a motion for summary judgment when "there is no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court "constru[es] all facts, and draw[s] all reasonable inferences from those facts, in favor of the nonmoving party." *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotation marks and citation omitted). The moving party has the initial burden to show that the evidence is insufficient to establish a material element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the non-moving party must then "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If the evidence supporting the non-moving party's claim is insufficient for a reasonable jury to return a verdict in its favor, the court will grant summary judgment. *Id.*

As explained below, the court concludes that Plaintiff has not presented evidence sufficient for a reasonable juror to conclude that TLC was her employer. Although this is the dispositive issue in the case, the court pauses briefly to address her substantive claims.

**I.   Hostile Work Environment / Retaliation**

To survive summary judgment on her claim of sexual harassment, Nardi must present evidence that she was harassed because of her sex, and that the harassment was severe or pervasive enough to create an objectively hostile work environment. *See Alexander v. Casino*

*Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). To establish a prima facie case of retaliation, Plaintiff must show that she "(1) engaged in a statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) [was] treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Alexander*, 739 F.3d at 983.

A plaintiff can establish a hostile work environment if discriminatory conduct is "so severe or pervasive that it altered the conditions of the employment relationship." *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014). That said, "Title VII is not . . . a general civility code" and it does not protect employees from normal petty slights, minor annoyances, or routine workplace grievances. *Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Nardi has offered only minimal evidence that her work environment was objectively hostile or that she was subjected to harassing conduct that was severe or pervasive. She asserts that co-workers viewed pornographic websites on their work computers, though she does not specify how frequently this occurred, and offers evidence that on November 1, 2006 she received a pornographic e-mail, which she found offensive. Though unpleasant and inappropriate, co-worker attention to pornography was not physically threatening or humiliating, nor was it directed at Nardi. The e-mail was crude and sophomoric, but even if it is construed as having been directed at Nardi, it was an isolated event and therefore insufficient to establish an objectively hostile work environment. *See e.g.*, *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 729–30 (7th Cir. 2013) ("Showing [plaintiff] one video containing a momentary display of male nudity does not come close to reaching the required level of severity for a sexual harassment claim."); *Cowan v. Prudential Ins. Co. of America*, 141 F.3d 751, 757–58 (7th Cir. 1998) (affirming summary judgment for employer; circulating a safe-sex cartoon and a photograph of a co-worker with a stripper was not severe

enough to support liability). Nor can Nardi establish that her co-workers engaged in the alleged conduct because of her sex. *See Orton-Bell v. Indiana*, 759 F.3d 768, 774 (7th Cir. 2014) (plaintiff's sex discrimination failed because, while co-workers having sex on her desk at night was objectively offensive, "[t]he notion that night-shift staff had sex on her desk *because* she was a woman is pure speculation.") (emphasis in original). Nardi offers no basis for concluding that Allen sent her the November 1, 2006 e-mail because of her sex.

Nardi's retaliation claim on its face has a firmer foundation. She made a complaint on November 2, 2006, and termination swiftly followed. Defendant notes evidence that she had received two written warnings before November 2, 2006, but the court does not view this as compelling evidence of misconduct. These warnings establish only that ALG disciplined Ms. Nardi for revealing her interest in finding another job and perhaps for complaining about being denied the opportunity to visit a new baby grandchild. The court is uncertain that either behavior obviously merits discipline. Even assuming the legitimacy of these warnings, however, the timing of her termination appears suspicious. Perhaps because ALG was not served and was not involved in discovery, there is no evidence of what behavior, if any, Ms. Nardi engaged in after voicing a complaint that was sufficiently serious to support discharge. Notably, however, Ms. Nardi has admitted that Steve Cargill, an ALG employee, made the decision to fire her. TLC asserts that Cargill had no knowledge of her complaint; Plaintiff offers no evidence to rebut that assertion. In any event, the court concludes that a claim of retaliation could proceed, if at all, only against Ms. Nardi's employer.

II.     **Nardi and TLC's employment relationship**

TLC argues that it is entitled to summary judgment because Nardi was not a TLC employee and "[i]t is only the employee's employer who may be held liable under Title VII." *Whitaker v. Milwaukee Cnty.,* 772 F.3d 802, 811 (7th Cir. 2014) (quoting *Robinson v. Sappington*, 351 F.3d 317, 332 n.9 (7th Cir. 2003)). Where there is a dispute about this issue, it can be difficult to sort out because, as the Seventh Circuit has noted, the statutory definitions

of employee and employer are "vague and circular." *Bluestein v. Cent. Wisconsin Anesthesiology, S.C.,* 769 F.3d 944, 951 (7th Cir. 2014). "Employee" is defined as "an individual employed by an employer." 42 U.S.C. § 2000e(f). An employer is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). Courts have therefore relied on common law definitions to categorize employment relationships. *Whitaker*, 772 F.3d at 811 ("the term 'employer' as used in Title VII is a statutory expression of traditional principles of respondeat superior liability.") (quoting *Robinson*, 315 F.3d at 332 n.9.); *see also Bluestein v. Central Wisconsin Anesthesiology, S.C.*, 769 F.3d 944, 951 (7th Cir. 2014) (explaining that, because the ADA does not "provide a working definition" of term employee, "courts should turn to the common law test for determining who qualifies as an employee.").

The parties debate which common-law approach the court should use to determine whether TLC was Nardi's employer. Plaintiff invokes the "economic realities" test used in Title VII cases to determine whether an individual is an employee or an independent contractor. That test sets forth five factors:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payments and benefits, and (5) the length of the job commitment and/or expectations.

*Alexander v. Rush North Shore Medical Center,* 101 F.3d 487, 492 (7th Cir. 1996) (internal quotation marks and citations omitted). Though there are five factors, "the employer's right to control is the 'most important' consideration in ascertaining the existence of an employer-employee relationship." *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 703 (7th Cir. 2015).

Defendant argues that the economic realities test is not applicable here and that the court should adopt the joint-employer test from labor law cases instead. (TLC Mem. at 7; TLC

Reply at 3.)  Most recently, the National Labor Relations Board expanded the circumstances in which that test is met, explaining that

> two or more statutory employers are joint employers . . . if they "share or codetermine those matters governing the essential terms and conditions of employment."  In determining whether a putative joint employer meets this standard, the initial inquiry is whether there is a common-law employment relationship with the employees in question. If this common-law employment relationship exists, the inquiry then turns to whether the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining. **Central to both of these inquiries is the existence, extent, and object of the putative joint employer's control** [over such issues as hiring, discipline and termination, wages and benefits, scheduling and hours, work processes, and training].

*Browning-Ferris Industries of Calif., Inc.,* 362 NLRB No. 186 (August 27, 2015) (emphasis supplied).  The labor law test addresses whether, and with whom, an employer is required to engage in collective bargaining.  As TLC notes, however, courts in this district and others have applied the "joint employer" rubric in Title VII cases, as well, imposing liability on temporary employment agencies that participate in a discriminatory act of a client.  *See e.g., Lucas v. Ferrara Candy Co.,* No. 13-CV-1525, 2014 WL 3611130, at *7 (N.D. Ill. July 22, 2014) (Lee, J.) (plaintiff's allegations that employment agency played a direct role in recruiting, training, assigning, and paying laborers were sufficient to survive a motion to dismiss); *Lucas v. Gold Standard Baking, Inc.,* No. 13-CV-1524, 2014 WL 518000, at *3 (N.D. Ill. Feb. 10, 2014) (Ellis, J.) (allegations that employment agency acts as an agent "in recruiting, training, assigning and paying laborers" sufficient to state a claim against agency as well as plaintiffs' direct employer); *Piano v. Ameritech/SBC*, No. 02-CV-3237, 2003 WL 260337, at *5 (N.D. Ill. Feb. 5, 2003) (Lindberg, J.) ("[T]he joint employer theory should apply in cases in which an individual is employed by a temporary employment agency, but suffers discrimination by the employer to which he or she is assigned, where that employer exerts a significant amount of control over the individual."); *cf. Mays v. BNSF Ry. Co.,* 974 F. Supp. 2d 1166, 1178 (N.D. Ill. 2013) (Feinerman, J.) (though joint employer theory was available to plaintiff, freight company was entitled to summary judgment because evidence established that only its subcontractor was responsible

for hiring, directing and supervising plaintiff); *Shah v. Littelfuse Inc.*, No. 12-CV-6845, 2013 WL 1828926, at *3 (N.D. Ill. Apr. 29, 2013) (Kendall, J.) (conclusory statement that employment agency was a "joint employer" was insufficient to state a claim against employment agency, where "nearly every factual allegation in [plaintiff's] complaint pertains to" the direct employer).

For purposes of this case, there appears to be no significant difference between the test articulated in labor law cases and the test that appears in employment discrimination cases: both focus on the extent of control and supervision an entity exerts over the plaintiff, though the economic realities test also examines the financial underpinnings of the relationship. The Seventh Circuit applies both "economic realities" and "joint employer" language in recent employment discrimination cases. Thus, in *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892 (7th Cir. 2015), the plaintiff, a custodian, alleged that the manager of an office building where he worked was involved in discriminating against him on the basis of his national origin The Court of Appeals recognized that "[a] Title VII plaintiff might have *joint* employers,." *id.* at 895–96 (emphasis in original) (citing *Tamayo v. Blagojevich,* 526 F.3d 1074, 1088 (7th Cir. 2008)), but it concluded that plaintiff's claim failed on the merits. The case that *Skylarsky* cited for the "joint employer" test held that "multiple entities may be considered an employee's 'employer' for the purposes of Title VII liability," and explained that "courts must look to the 'economic realities' of the employment relationship, as well as 'the degree of control the employer exercises,' to determine whether an entity may be considered an employer for the purposes of Title VII liability." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1088 (7th Cir. 2008) (quoting *Heinemeier v. Chemetco, Inc.,* 246 F.3d 1078, 1080, 1083 (7th Cir. 2001)).

In *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697 (7th Cir. 2015), the Seventh Circuit considered plaintiff's effort to impose liability on a general contractor for race discrimination on the part of a subcontractor which had hired plaintiff. *Id.* at 701. Under any version of the appropriate test for determining who is the employer, the court explained, the question is "whether the putative employer exercised sufficient control, and whether the 'economic realities'

are such that the putative employer can be held liable under Title VII." *Love*, 779 F.3d at 702, citing *Knight v. United Farm Bureau Mutual Insurance Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991). In *Love*, though the general contractor controlled access to the work site and required employees to undergo safety training, it did not hire plaintiff, did not set plaintiff's work hours, assign or directly supervise his projects, or make decisions regarding promotion or demotion. *Id.* at 703. Under these circumstances, the Seventh Circuit concluded "that [the general contractor] exercised insufficient control over [plaintiff], such that no reasonable jury could conclude that [the general contractor] was [plaintiff]'s indirect employer under Title VII." *Id.* at 701. The district court therefore properly entered summary judgment for the general contractor.[3]

The evidence Plaintiff relies on to establish that TLC was her employer is limited to certain printed forms and procedures. Plaintiff notes that she received paychecks and an employee handbook from TLC; that TLC personnel reviewed insurance and benefits information with her; that TLC provided the forms for employee review and discipline; and that she was directed to call TLC if she experienced harassment. (Pl.'s Ans. to Def.'s Mot. for Summ. J. [31], 3.) It is undisputed that TLC issued Plaintiff's paychecks and administered employment benefits. Plaintiff also suggests that TLC was involved in her hiring and firing, relying, again, on

---

[3] In some jurisdictions, the joint-employer standard may differ from the economic realities test in that the joint-employer status allows a plaintiff to treat two employers as one, essentially imposing vicarious liability on one employer for the discriminatory actions of the co-employer. The Seventh Circuit, however, has expressed some reluctance about applying this version of the joint employer test in Title VII cases, explaining that "reliance on traditional labor law principles" is "an awkward approach to determining Title VII liability" that "has been employed infrequently in employment cases in this circuit*." Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 810–11 (7th Cir. 2014). The Court of Appeal's primary concern was the plaintiff's attempt to use joint-employer status to "make an entity other than the principal employer liable for conduct relating to a specific employee," particularly where the plaintiff sought to "obtain relief for alleged State-employee misconduct despite the State's immunity . . . ." *Id.* at 811–12. The Seventh Circuit, thus, appears unwilling to impose a form of vicarious liability on one employer for the acts of another. *Id.* at 811 ("Some of our sister circuits have held explicitly that establishing a 'joint employer' relationship does not create liability in the co-employer for actions taken by the other employer . . . We have no reason to depart from the course set by the other circuits.").

documents: The November 10, 2006 letter to Nardi from "The TLC Companies Personnel Department" states, "[p]lease be advised that effective November 10, 2006 you are no longer an employee of The TLC Companies." (Termination Letter.) Moreover, the written warnings she received for her behavior bear TLC logos. (*See* May Warning; Oct. Warning.) Finally, TLC acknowledges that it "screens selected candidates upon hiring," (D. SOF ¶ 7; Pl.'s Resp. to SOF ¶ 7), and though TLC does not specify what the screening entails, Plaintiff characterizes this admission as evidence that TLC plays at least some role in the hiring process, as well.

As TLC notes, however, other undisputed evidence defeats a finding of an employer relationship. In assessing this issue, the "right to control is the most important consideration . . . ." *Love,* 779 F.3d at 702 (internal quotations removed). Further, "when control is examined, 'the key powers are, naturally those of hiring and firing.'" *Id.* at 703, quoting *E.E.O.C. v. State of Illinois*, 69 F.3d 167, 171 (7th Cir. 1995). Nardi's own factual concessions are dispositive here. Nardi has admitted that TLC's client companies generally "recruit, interview and hire their own candidates." (D. SOF ¶ 5; Pl.'s Resp. to SOF ¶ 5.) She also concedes that "TLC did not review Plaintiff's work product or direct her work" and that TLC "did not discipline Plaintiff and did not set Plaintiff's hours." (D. SOF ¶14; Pl.'s Resp. to SOF ¶ 14.) It is undisputed that no TLC employee played any role in issuing the written warnings that Plaintiff received. Most importantly, it was Steve Cargill of ALG who recommended Plaintiff's termination and Pat Delmonico, one of ALG's owners, who made the final decision. True, the termination notice refers to Plaintiff's status as "no longer an employee of the TLC Companies," and provides information about maintaining insurance benefits, post-discharge. Plaintiff has offered no substantive evidence that TLC was involved in the discharge decision itself, however. Whatever the merits of ALG's practice of outsourcing payroll administration, there is no evidence that Plaintiff herself was uncertain who her employer was, who controlled her work, who issued discipline, or who made the termination decision. In *Love,* similarly, the defendant general contractor did not hire plaintiff, set his hours, or supervise his work; though the general

contractor in that case did retain the power to remove plaintiff from the worksite altogether, it was not liable for discrimination by plaintiff's direct employer. 779 F.3d 702-03. To conclude otherwise in this case would elevate form over substance.

## **CONCLUSION**

TLC's motion for summary judgment [23] is granted.

ENTER:

Dated: September 21, 2015

_____
REBECCA R. PALLMEYER
United States District Judge